**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

| | |
|---|---|
| DIANE CULVER, ALAN MANER, CARTER WHITESIDE, and TYLER SMITH<br>      on their own behalf and on behalf of all others similarly situated,<br><br>                    *Plaintiffs,*<br><br>          v.<br><br>FACTORY MUTUAL INSURANCE COMPANY (FMIC aka "FM GLOBAL").<br><br>                    *Defendant.* | Civil Action No.: _____<br>Jury Trial Demanded |

**CLASS ACTION COMPLAINT**

1.      Plaintiffs Diane Culver, Alan Maner, Carter Whiteside, and Tyler Smith, on behalf of themselves and all others similarly situated, complain as follows against Factory Mutual Insurance Company (FMIC aka "**FM Global**").

2.      This is a class action brought to remedy a pattern of discrimination against employees who requested religious accommodations from FM Global's mandate that employees receive a COVID-19 vaccine.

3.      Rather than complying with its obligations to provide reasonable accommodations under Title VII of the Civil Rights Act of 1964 ("**Title VII**"), FM Global responded by informing *all* employees requesting religious exemptions that they would be put out of work.

4.      Contrary to FM Global's pretextual goal of "safety," there was no legitimate business justification for these actions.  As has been seen with other employers, the "real reason

for the vaccine mandate . . . [wa]s 'virtue signaling' and 'currying political favor.'" *Sambrano v. United Airlines*, 45 F.4th 877, 879 (5th Cir. 2022) (Ho, J., concurring in denial of rehearing en banc); *see also Louisiana v. Becerra*, 2021 WL 5609846, at *14 (W.D. La. Nov. 30, 2021) ("Although CMS spent pages and pages attempting to explain the need for mandatory COVID-19 vaccines, when . . . millions of people have already been infected, developing some form of natural immunity, and when people who have been fully vaccinated still become infected, *mandatory vaccines as the only method of prevention make no sense*." (emphasis added)).

5.       But this case is not about whether the company could or even should have put a mandate in place.  It is about whether FM Global could have accommodated sincerely held religious beliefs when it was within the company's power to do so at little to no cost.  After all, a company's advertising or virtue signaling goals are not permitted to trump Title VII.

6.       Proof that FM Global could have accommodated religious requests was seen in its granting of accommodations for medical requests—and in at least one case where an individual's religious request had already been denied.  The company simply disfavored *religious* exemptions. FM Global was able to accommodate employees' medical needs without any burden but terminated its religious employees when the exact same accommodation options were available.

7.       FM Global's actions left employees (such as Plaintiffs) with the impossible choice of either taking the COVID-19 vaccine—at the expense of their religious beliefs—or losing their livelihoods and the ability to provide for their families—also a religious command.

8.       The result: scores of employees were terminated while hundreds more were forced to violate their faith in order to meet an unscientific medical dictate.  Title VII was written to avoid just such actions taken by zealous employers against their employees' religious rights. *Sambrano v. United Airlines*, 19 F.4th 839, 842 (5th Cir. 2021) (Ho, J., dissenting from denial of stay pending

appeal) ("And '[a]t the risk of belaboring the obvious, Title VII aimed to ensure that employees would *not* have to sacrifice their jobs to observe their religious practices.'" (quoting *Adeyeye v. Heartland Sweeteners*, 721 F.3d 444, 456 (7th Cir. 2013))).

## PARTIES

9.      Plaintiff Diane Culver was a Client Processing Specialist with FM Global.  Ms. Culver requested a religious accommodation from FM Global's vaccine mandate, to which FM Global responded by questioning her sincerely held religious beliefs and then terminating her employment with the company.  Based on the undeniable sincerity of her religious beliefs, she chose termination over vaccination.  Ms. Culver is a citizen and resident of Jacksonville, Texas.

10.      Plaintiff Alan Maner was a Senior Consultant with FM Global.  Mr. Maner requested a religious accommodation from FM Global's vaccine mandate, to which FM Global responded by questioning his sincerely held religious beliefs and then terminating his employment with the company.  Based on the undeniable sincerity of his religious beliefs, he chose termination over vaccination.  Mr. Maner is a citizen and resident of Frisco, Texas.

11.      Plaintiff Carter Whiteside was an Engineering Specialist with FM Global.  Mr. Whiteside requested a religious accommodation from FM Global's vaccine mandate, to which FM Global responded by questioning his sincerely held religious beliefs and then terminating his employment with the company.  Based on the undeniable sincerity of his religious beliefs, he chose termination over vaccination.  Mr. Whiteside is a citizen and resident of Texarkana, Texas.

12.      Plaintiff Tyler Smith was an Account Manager with FM Global.  Mr. Smith requested a religious accommodation from FM Global's vaccine mandate, to which FM Global responded by questioning his sincerely held religious beliefs and then terminating his employment

with the company.  Based on the undeniable sincerity of his religious beliefs, he chose termination over vaccination.  Mr. Smith is a citizen and resident of Celina, Texas.

13.     Defendant FM Global is a Delaware corporation with its headquarters in Johnston, Rhode Island.  FM Global has offices worldwide, including a major corporate office in Frisco, Texas.

14.     Defendant FM Global Holdings, Inc. is the parent corporation of FM Global.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1331, 1343, and 42 U.S.C. § 2000e-5(f)(3).

16.     Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202.

17.     Venue is proper in this judicial district pursuant to: (1) 28 U.S.C. § 1391(b) because a substantial part of the events complained of herein occurred in this District; and (2) 42 U.S.C. § 2000e-5(f)(3) because the unlawful employment practice took place in this District.

18.     This case challenges FM Global's decision to implement a COVID-19 vaccine mandate without also granting reasonable accommodations as required under Title VII.

19.     FM Global's actions against each of the Plaintiffs took place in this District.  Each of the named Plaintiffs have been and are being harmed in this District.

## BACKGROUND

**A.     The COVID-19 Pandemic and Response**

20.     By Spring 2020, the novel coronavirus SARS-CoV-2, which can cause the disease COVID-19, spread rapidly around the world.

21.     Over the past two years, at least four separate COVID-19 vaccines have been developed and authorized or licensed for use in the FM Global States.  The Food and Drug Administration ("**FDA**") issued an Emergency Use Authorization ("**EUA**") for the Pfizer-BioNTech vaccine on December 1, 2020.  One week later, the FDA issued a second EUA for the Moderna COVID-19 vaccine.  The FDA issued an EUA for the Johnson & Johnson ("**Janssen**") COVID-19 vaccine on February 27, 2021.  And most recently, the FDA issued an EUA for the Novavax COVID-19 vaccine on July 13, 2022.  The Pfizer-BioNTech vaccine received FDA approval for use in a slightly altered form on August 23, 2021, and is said to be produced as Comirnaty—a form legally distinct from the EUA version.  The Moderna vaccine, Spikevax, has also now received FDA approval.

22.     Subsequent to the development of the vaccines, the Delta and Omicron variants of COVID-19 spread around the world from late Summer 2021 through the Winter and into 2022.  In light of those variants, the accompanying increases in transmissibility of the virus, and the significant waning of the vaccines' efficacy, the FDA began recommending booster shots in addition to the initial vaccine regimens proposed.

23.     It was long known that vaccinated individuals could carry comparable viral loads to unvaccinated individuals.  Johns Hopkins Bloomberg School of Public Health, New Data on COVID-19    Transmission    by    Vaccinated    Individuals    (Aug.    2,    2021), https://publichealth.jhu.edu/2021/new-data-on-covid-19-transmission-by-vaccinated-individuals. While the vaccine was still thought to promote better outcomes for vaccinated individuals who took it, and symptomatic infections were higher among the unvaccinated, vaccinated individuals were still experiencing breakthrough infections at an unknown rate because they were often

asymptomatic and thus it was recommended that those individuals continue to mask in certain situations.

24.     Indeed, months before instituting its mandate, FM Global knew or should have known that the vaccines were largely ineffective at controlling the spread of COVID-19.  As early as July 2021, CDC Director Walensky admitted that the vaccinated had similarly high viral loads of SARS-CoV-2 as the unvaccinated and thus could still contract and spread the Delta variant.[1]  In August 2021, a joint study by CDC and the Wisconsin Department of Health services further confirmed Director Walensky's admission; the study indicated that vaccinated individuals had a 5% higher viral load than the unvaccinated and were not only just as likely to transmit the virus as the unvaccinated, but posed a greater contagion risk due to the increased likelihood of asymptomatic infection.[2]

25.     The CDC then subsequently recognized the fact that a prior COVID-19 infection provides protection superior to a vaccine alone.  CDC, *COVID-19 Cases and Hospitalizations by COVID-19 Diagnosis—California and New York, May–November 2021* ("CDC Report"), https://www.cdc.gov/mmwr/volumes/71/wr/mm7104e1.htm?s_cid=mm7104e1_w (noting that "[b]y October [of 2021], persons who survived a previous infection had lower case rates than persons who were vaccinated alone").

---

[1] *Statement from CDC Director Rochelle P. Walensky, MD, MPH on Today's MMWR*, CDC News Room (July 30, 2021), *available at* https://www.cdc.gov/media/releases/2021/s0730-mmwr-covid-19.html [https://perma.cc/VR5V-E67A] ("Today, some of those data were published in CDC's Morbidity and Mortality Weekly Report (MMWR), demonstrating that Delta infection resulted in similarly high SARS-CoV-2 viral loads in vaccinated and unvaccinated people.  High viral loads suggest an increased risk of transmission and raised concern that, unlike with other variants, vaccinated people infected with Delta can transmit the virus.").

[2]     *See* CDC Morbidity and Mortality Weekly Report (August 6, 2021) https://www.cdc.gov/mmwr/volumes/70/wr/mm7031e2.htm?s_cid=mm7031e2_w.; Kasen Riemersma, *et. al*, *Shedding of Infectious SARS-CoV-2 Despite Vaccination*, medRxiv (August 24, 2021), *available at* https://www.medrxiv.org/content/10.1101/2021.07.31.21261387v4.full.pdf.

26.     Additional studies have also shown that the vaccines forced on FM Global employees wane significantly over time.  Not only has this been confirmed by the CDC, *see id.*, one study showed Pfizer and Moderna efficacy dropping from 6% effectiveness against the Omicron variant in the first two months to -39% at 4 months and -42% at 6 months.  Sarah A. Buchan, *et al.*, *Effectiveness of COVID-19 vaccines against Omicron or Delta infection*, MEDRXIV [preprint] (Jan. 1, 2022), https://www.medrxiv.org/content/10.1101/2021.12.30. 21268565v1 (Table 2).  Another study showed a -76.5% efficacy for Pfizer and a -39.3% efficacy for Moderna against the Omicron variant.  Christian Holm Hansen, *et al.*, *Vaccine effectiveness against SARS-CoV-2 infection with the Omicron or Delta variants following a two-dose or booster BNT 162b2 or mRNA-1273 vaccination series: A Danish cohort study*, MEDRXIV [preprint] (Dec. 23, 2021), https://www.medrxiv.org/content/10.1101/2021.12.20.21267966v3 (Table).

27.     Omicron-specific booster shots have only recently been introduced. https://www.yalemedicine.org/news/omicron-booster-covid-19.  Despite the fact that FM Global emphasizes it is committed to protecting its workforce and supposedly follows CDC guidance, FM Global has not required boosters, even the Omicron-specific boosters, despite the CDC recommends boosters in most all circumstances.

28.     Currently, to be "Up to Date" or current with COVID-19 vaccinations, an individual must have received "the most recent booster dose recommended for you by CDC."  *Stay Up to Date with Your COVID-19 Vaccines*, CDC (Nov. 4, 2022), https://www.cdc.gov/coronavirus/2019-ncov/vaccines/stay-up-to-date.html?s_cid=11305:%2B Moderna%20%2B%20%2Bcovid%20%2Bvaccine:sem.b:p:RG:GM:gen:PTN:FY21#footnote02. For adults, this is a two-shot regimen of the Pfizer, Moderna, or Novavax vaccine or a one-shot dosage of the Janssen vaccine, followed by a booster after the primary series of either the Pfizer

or Moderna vaccine.  Previously, CDC recommended adults over 50 years old receive a second booster at least 4 months after the first booster.  *Id.* (when visited July 19, 2022).

### B.   FM Global's Vaccine Mandate

29.     On October 21, 2021, FM Global sent a company-wide email indicating that all employees "entering an FM Global office in the U.S." or who had "in-person contact or interaction with clients, brokers and third parties for company business" had to be "fully vaccinated" against the virus by November 15, 2021.[3]

30.     At this time, FM Global knew or should have known that the available COVID-19 vaccines did not prevent transmission of COVID-19.

31.     Employees not working in the United States were not made to follow this protocol.

32.     At that time, FM Global indicated that exempt employees would follow a masking/testing protocol as their reasonable accommodation.  (When request forms were issued, however, the company began asking individuals what accommodation they were seeking even though the accommodation had already been established.)

33.     Later, on November 23, 2021—after receiving a considerable number of exemption requests—the company sent another email indicating that everyone who had not begun a course of vaccination by December 13, 2021 would be terminated on January 4, 2022.  The "Mandatory vaccination" was for the "U.S. only."[4]

34.     FM Global's mandate was absolute—there was no alternative for periodic testing, mask wearing, or social distancing, even for employees who already had COVID-19 and still enjoyed immunity from the disease.  Employees were forced to choose vaccination or termination.

---

[3] Exhibit 1, Corporate Email of Oct. 21, 2021.

[4] Exhibit 2, Corporate Email of Nov. 23, 2021.

And for religious employees, the option of a reasonable accommodation proved to be strictly illusory, as evidenced by the 100% denial rate.

35.     FM Global's policy contrasted with the Federal Government's announcement made just a few weeks earlier indicating that the Department of Labor was developing a rule to require certain large employers to mandate vaccination *or* periodic testing for its employees.  FM Global did not offer the option of periodic testing, either in general or for employees entitled to an accommodation.

36.     The policy from FM Global also differed substantially from the European Union's digital COVID-19 certificate, which considered the following as equivalent: (1) a COVID-19 vaccine; (2) a negative COVID-19 test; or (3) having previously recovered from COVID-19.  *See EU Digital COVID Certificate*, EUROPEAN COMMISSION, https://ec.europa.eu/info/live-work-travel-eu/coronavirus-response/safe-covid-19-vaccines-europeans/eu-digital-covid-ertificate_en.

37.     FM Global evidently did not consider the ability of vaccinated individuals to contract and transmit the virus.

38.     Nor did FM Global consider the CDC's recognition that naturally occurring immunity from COVID-19 was at least as strong as vaccine-induced immunity.  *See* CDC Report *supra*.  For religious employees who had been immunized naturally, FM Global insisted that they utilize an artificial and less effective immunization strategy that would simultaneously force them to violate their sincerely held religious beliefs.

39.     When FM Global announced the vaccine mandate, it stated that employees could request accommodations for religious or health reasons.  This is in line with Equal Employment Opportunity Commission ("EEOC") guidance on private employers issuing such mandates.  *See What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO*

*Laws* §§ K.1 & K.2*.,* EEOC (May 28, 2021), https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws.   Again, though, FM Global's announcement was illusory for religious employees.

40.     Additionally, FM Global placed substantial and unconscionable pressure on its employees.  One of the many examples of such pressure, some of which are more specifically discussed below, occurred when Plaintiff Diane Culver was asked by her supervisor—who valued her contributions to his team—if she would "change her beliefs" in order to continue working for him.  Plaintiff Tyler Smith faced similar pressure and coercion from company management to acquiesce to the mandate.

41.     This pattern of hostility, coercion, and retaliation against those requesting religious accommodations was also confirmed by statements from the CEO of FM Global, Malcolm Roberts.  He informed a group of employees in Cleveland that that FM Global Executives had told local management to single out employees to try and convince them to come into compliance, even with the knowledge that those employees had requested accommodations for their religious beliefs. In other words, FM Global top management initiated a strategy to coerce employees into abandoning their religious beliefs (while also granting medical accommodations to some employees).  This discrimination against and hostility towards religious objectors was a company-wide effort.

42.     According to FM Global, the vaccination mandate was aimed at increased safety. Yet the company did not require regular testing—the most reliable protection against the spread of the virus, especially since it was widely known during the relevant timeframes that vaccinated individuals could contract and transmit COVID.  FM Global also only mandated the vaccine for employees in the United States who fell under the umbrella of "customer facing."

43.     FM Global also did not require booster shots, despite the CDC's strong recommendation that individuals take boosters to be "up to date" on their vaccinations (*i.e.*, actually fully vaccinated).

44.     All FM Global employees able to comply with the company's mandate were vaccinated with either the Pfizer, Moderna, or Janssen vaccine.[5]  Because many FM Global employees would have taken a COVID-19 vaccine long before the company's mandate, some of those individuals had not received a vaccine in more than 6 months (and realistically therefore more susceptible to infection than unvaccinated employees) when unvaccinated employees were put out of work.

45.     Additionally, FM Global operated for around a year through the pandemic while COVID-19 vaccines were available without mandating the treatment for its employees.

46.     And because FM Global operated with unvaccinated employees throughout the pandemic, vaccinations are clearly not part of the conduct of the company's operations.

**C.     Federal law prohibiting religious discrimination and retaliation**

47.     Title VII prohibits FM Global from discriminating against employees based on their religion.  42 U.S.C. § 2000e-2(a)(1).

48.     This "include[s] all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate an employee's . . . religious observance or practice without undue hardship on the conduct of the employer's business."  42 U.S.C. § 2000e(j).

---

[5] The recently developed Novavax vaccine was not approved for use during the implementation of FM Global's vaccine mandate.

49.     In other words, "[a]n employer has the statutory obligation to make reasonable accommodations for the religious observances of its employees, but is not required to incur undue hardship." *Weber v. Roadway Express*, 199 F.3d 270, 273 (5th Cir. 2000).

50.     Title VII also prohibits FM Global from retaliating against an employee for engaging in protected activity.  *See Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 319 (5th Cir. 2004).

### D.     FM Global's false interactive process for religious requests

51.     Once employees began submitting accommodation requests, FM Global followed up with individuals making religious requests to cast doubt on the legitimacy of their beliefs.  For instance, the company asked questions geared to probe and manipulate the beliefs of religious accommodation seekers, including whether they had received vaccinations in the past or had taken any prescription or non-prescription drugs since turning 18.  As evidenced by the 100% denial rate for religious exemption request, the process was instituted in bad faith, and was not calculated towards actually finding an accommodation option.  Rather, the process was a pre-calculated inquisition geared towards gathering information the company believed it needed to issue what were ultimately pretextual denials.

52.     Employees were specifically told not to clarify their statements about prior vaccinations or the taking of drugs as such clarifications would have undermined FM Global's attempts to use that information later against employees.

53.     FM Global also failed to equally apply standards for determining accommodation approvals.  Medical accommodations were routinely granted while religious requests were denied.

54.     Indeed, in at least one instance, FM Global granted a medical exemption request after denying the same individual's religious request.

55.    Other than asking questions designed to trap those seeking religious accommodations (or otherwise provide an excuse for the company to deny the request), there was no further interaction between FM Global and the employees.

56.    In announcing these rules, FM Global ignored the interactive process.  Questions designed to cast a shadow over employees' beliefs and develop a case against an accommodation can hardly be considered a good faith interactive process.

57.    Moreover, FM Global did not explain why one group of employees should be allowed to work with mitigation measures in place, while another (disfavored) group was unable to do so.

58.    FM Global was concerned about its reputational image in the industry, though. Evidently, FM Global believed other companies would think less of the insurer if it employed unvaccinated religious individuals and so it took steps to rid itself of as many disfavored religious employees as it could if they had what FM Global determined to be an "illegitimate" reason for not taking the vaccine.

59.    The company wanted to brand itself as "fully vaccinated" as a signal to other companies, even if that meant trampling on its religious employees' Title VII rights.  Moreover, demonstrating the pretextual nature of FM Global's vaccination strategy, FM Global's definition of "fully vaccinated" was only that someone take a primary series of the vaccine—not a step that would actually make someone "fully vaccinated".  The mandate was about virtue signaling and ridding itself of disfavored religious employees more than the safety of employees or customers. This is also why it was only ever made a requirement for US employees and not for all employees of the company.  A true safety requirement would be made global.

60.     FM Global's approach of harassment and accommodation denial stands in stark contrast to how the vaccine manufacturer Janssen (J&J) treated requests for accommodations. Even though Janssen employees were traveling to doctors' offices on a daily basis—coming into contact with patients and office staff alike—those employees were allowed to wear masks and only required to test for COVID if they showed symptoms.  The process at Janssen was straightforward as well, requiring only a statement indicating the sincerely held religious belief that required accommodation and not intruding into employees' personal lives any further.[6]

61.     But FM Global was more concerned with the sending the proper (virtue) signal to other companies than it was in dealing fairly with its employees unable to take a medical treatment that FM Global preferred that they take—especially if the employee's reason for declining the treatment was religious.

### E.     Plaintiffs' accommodation requests

***Diane Culver***

62.     Plaintiff Diane Culver was a Client Processing Specialist with FM Global, where she had worked for approximately 12 years.

63.     In that role, it was her responsibility to draft and issue insurance policy contracts and billing documents, as well as to capture and manage prospective and existing client locations and values.

64.     Ms. Culver was a consistently high performer for the company and 2020 was one of the best years professionally in her career.

---

[6] *See* Exhibit 3, Declaration of Donn Arizumi.

65.     Once the vaccine mandate was issued by FM Global, Ms. Culver sought an exemption from the company based on her sincerely held religious beliefs.  The exemption process consisted of two detailed (and intrusive) questionnaires.

66.     Ms. Culver first explained her sincere religious belief that the vaccine was tied to end-time events described in the Bible and a precursor to coming hardships that the faithful must endure.  Christians commonly refer to this period as the Great Tribulation and it is tied to the rise of the Anti-Christ.  Ms. Culver believes that period is beginning now and discerned in her spirit that the COVID-19 vaccines are part of the foundation for these spiritual events.  After consultation with a pastor and much prayer, she explained to FM Global that she could not be complicit with this evil and that her belief had been confirmed through a recent Bible study message she heard.

67.     After making that submission, FM Global followed up with a series of further questions, designed both to question her beliefs and to seek a basis on which her request could be denied.

68.     As with other employees seeking a religious accommodation, the company sent the following questions to Ms. Culver:

- Given what we have noted in our letter to you dated **October 18, 2021**, please clarify the precise connection between your religious principle, practice, tenet or belief and your inability to receive a COVID-19 vaccine and why:

- In support, please provide an independent statement of religious doctrine, from an authoritative religious leader or body where your religion has same, explaining what prohibits followers of your religious principle, practice, tenet or belief from receiving a COVID-19 vaccine:

- Since the age of 18, have you received any vaccination(s) (please circle YES or NO only – **do not provide any additional information at this time** and please note that we reserve the right to ask your medical practitioner to confirm your response): YES    NO

- Since the age of 18, have you taken any pharmaceutical(s) (drugs), whether prescription or non-prescription (over-the-counter) (please circle YES or NO only – **do not provide any additional information at this time** and please note that we reserve the right to ask your medical practitioner to confirm your response):    YES    NO

69.     When FM Global informed her that she would need to explain herself better and began asking its loaded questions, Ms. Culver knew that the company had no intention to take her faith seriously.

70.     After alerting the company to the fact that the final two questions were inapplicable to her sincerely held religious belief, an HR representative told her that FM Global would immediately deny her application if she refused to answer (which was itself pretextual, given that the company would not have accepted her exemption request no matter how she did or did not answer).  Mr. Culver answered but knew that the company was going to deny her request either way.

71.     On November 4, 2021, Ms. Culver was informed that "[a]fter careful review, the Company has determined that you have not shown a satisfactory basis for an accommodation on religious grounds and the request is therefore denied."  The letter went on to state that Ms. Culver had five days to inform the HR Business Partner if she had the "intention to come into compliance" with the mandate or else she would face "disciplinary consequences"—including termination.

72.     FM Global did not consider alternatives for Ms. Culver such as telework or even allowing her to pay for her own COVID-19 testing (as noted above, the most reliable mitigation measure against the virus).

73.     Subsequently, on December 15, 2021, a new manager called Ms. Culver on Microsoft Teams to ask if she had changed her mind about getting the vaccine.  She asked if he was inquiring as to whether she would change her beliefs to keep her job.  He replied 'Yes' and Ms. Culver then informed him that her faith was the most important thing in her life and that she would not sacrifice her beliefs for FM Global or anyone else.

74.     After testing positive for COVID-19 during the Christmas holidays, Ms. Culver called FM Global on December 27, 2021 to make sure they knew she recently had the virus.  Not only would a prior infection have provided her with immunity superior to that of those employees who had only been vaccinated, it was also against CDC Guidance to take a vaccination so close to having the virus and thus Ms. Culver should not have taken the shot even if she were willing to sacrifice her sincerely held religious beliefs for her livelihood.

75.     Rather than make an allowance for either her scientifically accepted natural immunity or the CDC's Guidance that someone with a recent infection not take the vaccine, FM Global proceeded to terminate Ms. Culver on January 4, 2022.

76.     Not only was FM Global's action against both Title VII and CDC Guidance, it was also a violation of Texas Executive Order GA-40, issued on October 11, 2021.  FM Global is an "entity in Texas"—as shown by the presence of its office in Frisco, Texas—that "compel[led] receipt of a COVID-19 vaccine" by an employee "who object[ed] to such vaccination . . . based on a religious belief."

77.     Subsequently, in a further act of retaliation, FM Global contested Ms. Culver's unemployment claims by incredibly complaining to the Texas Workforce Commission that she was not eligible for it due to her termination for failure to follow the company's draconian policy.

78.     FM Global's actions have harmed and continue to harm Ms. Culver both financially and mentally.  In addition to losing a substantial portion of income (which will, in turn, prevent her husband from retiring next year as planned), she has suffered panic attacks, insomnia, and severe anxiety from the company's actions—and all at a time when the company had unlawfully stripped her of her health insurance.  The ostracization and coercion by FM Global have replaced her pension with anti-depressant medication.

79.     Finally, the emotional damage runs deep for Ms. Culver her company (that claimed it was a team that valued everyone) had individuals—including people she did not even know—contact her and question the sincerity of her deeply held religious beliefs.  It was hurtful and insulting, and Ms. Culver felt powerless to stop FM Global's inquisition.

***Alan Maner***

80.     Plaintiff Alan Maner was a Senior Consultant with FM Global.  He worked for the company for more than 15 years, consistently rated as a high performer.

81.     In that position, Mr. Maner was responsible for engagement with clients, both internally (FM Global operations) and externally.  His work revolved around understanding client business models, identifying critical elements of those operations, analyzing the financial statements of the organization, and then connecting profitability and other measures of value to the company's critical pieces.

82.     In early October 2021, when FM Global first initiated communication about a mandatory vaccine policy, Mr. Maner immediately requested the document to apply for a religious exemption.

83.     During the initial stage of the exemption request process, Mr. Maner provided a detailed explanation of his sincerely held religious belief that prevented him from taking the vaccine.  His need for an accommodation was based on two things.  First, the vaccines—through either their components or their testing processes—are tied to aborted fetal stem cell lines.  Because Mr. Maner has a sincerely held religious belief against abortion, the Bible instructs him not to participate in any way with that evil.  Second, Mr. Maner believes that God made our bodies as His temple and that it would dishonor God for him to take a corrupted substance such as the COVID vaccines.  It is for these same reasons that he has declined flu vaccines for many years and has sought to reduce the adoption of vaccines for his children.  Mr. Maner filed his request with the company on October 13, 2021.

84.     In addition to the extended discussion of his sincerely held religious beliefs, Mr. Maner's application for an exemption also detailed possible accommodations for FM Global to consider.  These included virtual working, testing, and masking.  Not only was testing and masking used by other companies, Mr. Maner did not have to be onsite with clients and had performed much of his job virtually even prior to the pandemic.

85.     The second stage of the process consisted of FM Global sending several questions to Mr. Maner designed to provide the company with a basis to deny Mr. Maner's request.  Though it was clear what his beliefs were from the initial submission—and the basis for those beliefs—the company sent the following questions to Mr. Maner:

- Given what we have noted in our letter to you dated **October 18, 2021**, please clarify the precise connection between your religious principle, practice, tenet or belief and your inability to receive a COVID-19 vaccine and why:

- In support, please provide an independent statement of religious doctrine, from an authoritative religious leader or body where your religion has same, explaining what prohibits followers of your religious principle, practice, tenet or belief from receiving a COVID-19 vaccine:

- Since the age of 18, have you received any vaccination(s) (please circle YES or NO only – **do not provide any additional information at this time** and please note that we reserve the right to ask your medical practitioner to confirm your response): YES    NO

- Since the age of 18, have you taken any pharmaceutical(s) (drugs), whether prescription or non-prescription (over-the-counter) (please circle YES or NO only – **do not provide any additional information at this time** and please note that we reserve the right to ask your medical practitioner to confirm your response):    YES NO

86.    The nonsensical request for "clarification" (given his prior submission) and accusatory questions made it obvious to Mr. Maner that FM Global was not interested in a good-faith interactive process but was rather trolling for information it could try to use to argue against his religious beliefs.

87.    This goes against the EEOC's warning to employers that: "the employer should ordinarily assume that an employee's request for religious accommodation is based on a sincerely held religious belief, practice, or observance.  However, if an employee requests a religious

accommodation, and an employer is aware of facts that provide an objective basis for questioning either the religious nature or the sincerity of a particular belief, practice, or observance, the employer would be justified in requesting additional supporting information."  EEOC, *What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws*, Part K.12.  FM Global had no basis for questioning Mr. Maner's religious beliefs, let alone an objective basis.

88.     Nevertheless, FM Global sent Mr. Maner a letter on November 4, 2021, stating that "[a]fter careful review, the Company has determined that you have not shown a satisfactory basis for an accommodation on religious grounds and the request is therefore denied."  The letter went on to state that Mr. Maner had five days to inform the HR Business Partner if he had the "intention to come into compliance" with the mandate or else he would face "disciplinary consequences"— including termination.

89.     Even a cursory review of Mr. Maner's religious accommodation request shows that this statement by the company did not reflect reality, though.  And certainly a "careful review" could not have arrived at dismissing his beliefs so easily.

90.     Refusing to sacrifice his sincerely held religious beliefs to satisfy the company's illicit goals, Mr. Maner was fired on January 4, 2022 for failing to take a COVID-19 vaccine.

91.     At no point did FM Global contact Mr. Maner about a reasonable accommodation or consider accommodating Mr. Maner even though he already had natural immunity from COVID-19 after having recovered from an infection and even though he would have been willing to even pay for his own testing had the company wanted him to follow the accommodation protocol that others were given.

92.     As noted above, this was also a violation of Texas Executive Order GA-40, issued on October 11, 2021, because FM Global is an "entity in Texas"—as shown by the presence of its office in Frisco, Texas—that "compel[led] receipt of a COVID-19 vaccine" by an employee "who object[ed] to such vaccination . . . based on a religious belief."

93.     FM Global's actions have harmed and continue to harm Mr. Maner both financially and emotionally.

94.     In addition to robbing him of his income and pension, the company's illegal actions have forced Mr. Maner to deal with depression and anxiety.  He now meets regularly with a support group to help manage the burden caused by the loss of his job and the feelings of hopelessness that have surrounded it.

95.     Mr. Maner—the sole breadwinner for his wife and four children—has also been forced to liquidate his savings, incur credit card debt, and postpone medical care for his wife and children because of FM Global's actions.  As a result, his long-standing back problems have been exacerbated.

***Carter Whiteside***

96.     Plaintiff Carter Whiteside was an Engineering Specialist with FM Global.  He worked for the company for almost a decade.

97.     In that role, Mr. Whiteside was responsible for completing property loss prevention visits for FM Global clients throughout Texas, Oklahoma, Arkansas, and Louisiana.  He was involved in working with clients to identify and evaluate property and business exposures for clients.  After identifying exposures, Mr. Whiteside would help clients develop loss prevention solutions.

98.     Though he enjoyed on-site client visits, Mr. Whiteside's job was particularly well-suited for telework.

99.     Mr. Whiteside was a consistently high performer for the company, always ranking in the top 2-3 field engineers out of the almost 50 in the Dallas area.

100.    Mr. Whiteside chose FM Global for his career path right out of college because he was promised a family environment where he could enjoy serving clients for the next 30+ years in a positive company culture.

101.    He began with FM Global in the Dallas area for a year before being relocated to Texarkana, Texas to serve clients in Arkansas, Louisiana, East Texas, and Southeast Oklahoma.

102.    Around 2019, Mr. Whiteside noticed that the culture at FM Global began to shift with the company's focus shifting from customer service to profitability only.  This seemed to have been accelerated by the COVID-19 pandemic.

103.    Once the pandemic hit, his work shifted to remote surveys of facilities over Zoom.  This remote work continued even though the company would ask if employees were comfortable traveling and conducting in-person surveys and even though Mr. Whiteside's customers would ask why he was not coming to visit in person as he had always done.  The remote work combined with the decreased travel expenses led to extremely profitable years for FM Global in both 2020 and 2021.

104.    Mr. Whiteside was allowed to begin seeing clients in person again in 2021 and he did so, even while colleagues remained at home conducting remote surveys.

105.    During that time, Mr. Whiteside would conduct his work following company guidelines including: wearing a mask, socially distancing, and revealing his vaccination status to

clients prior to his arrival.  None of his clients ever indicated even so much as a concern that he had not taken a COVID-19 vaccine.

106.    As vaccines began increasing in popularity—especially with FM Global management—Mr. Whiteside was asked numerous times (never by clients; only by co-workers and management) if he was vaccinated.  While he had no problem saying that he was not, FM Global began creating a culture where the unvaccinated were shunned and ridiculed, no matter their personal reason for being unvaccinated, even though the company knew that there were those such as Mr. Whiteside who would be unable to take the vaccine due to their religious beliefs.

107.    Multiple managers attempted to get Mr. Whiteside to take the vaccine over the course of 2021 with one telling him it was the biggest mistake of his career to not get the shot.

108.    As a remote employee, Mr. Whiteside would typically only be in the office 2-3 times each year for meetings or trainings even before the pandemic.  The Dallas office was closed for a year and a half throughout the pandemic.

109.    On September 22, 2021, FM Global sent an email requesting that all employees planning to return to the office in October provide proof of vaccination.  Because he was not planning on returning to the office (since he rarely worked there anyway), Mr. Whiteside did not provide anything.

110.    On October 8, 2021, FM Global sent out a second email requesting that all employees submit proof of vaccination "to allow FM Global to manage a safe workspace."  During the height of the pandemic—the Delta wave—the company inexplicably was planning on reopening offices even though it knew both vaccinated and unvaccinated employees could contract the virus.  Ultimately, FM Global did not fully reopen its offices until February or March of 2022.

111.    This "re-opening" announcement was not about business operations, and certainly was not about workplace safety.  It did, however, create an illicit foundation needed to deny religious exemption requests.

112.    The October email was also the first communication stating "if you have not been vaccinated there is a process to request an exception for medical or religious reasons.  Please contact Melinda Smith, our HR Business Partner if you want to pursue an exception.  If the exception is granted you will be allowed to come to the office but must wear a mask except when eating or drinking and will need to have a negative COVID test each week."

113.    Mr. Whiteside sought an exemption from the company based on his sincerely held religious beliefs.  At the time, FM Global had a corporate policy stating on the website that "Group 1 Covered Individuals [such as Mr. Whiteside] are not required to disclose their vaccination status or respond to FM Global requests for disclosure of their vaccination status if they object to a vaccination status based on a qualifying medical condition or sincerely held religious beliefs."

114.    Mr. Whiteside continued to go into the field to complete visits at client sites in order to increase FM Global's profitability.  He was working at a paper mill during the week of November 8, 2021 and had been on site for four days working with the client (while following FM Global protocols).  He was scheduled to complete a closing conference with 15-20 members for the mill management team on Friday morning but was called on Thursday afternoon by his manager to see where he was and what he was doing.  The manager told him that a new policy had been enacted and that Mr. Whiteside was not allowed to go back to the mill the next morning.  He would have to conduct the closeout meeting virtually because he was unvaccinated.

115.    The same day, Mr. Whiteside submitted his request for a religious accommodation. Prior to that, he had spoken with his manager about the situation and his manager had been

forthcoming that the request would be denied.  Accordingly, the manager advised Mr. Whiteside he should just go ahead and get vaccinated.

116.    Mr. Whiteside's detailed request was based on multiple religious beliefs, including (1) the fact that the COVID-19 vaccines were each either developed or tested on fetal stem cell lines derived from an abortion; (2) that his body is the temple of the Holy Spirit and God did not want him to pollute it with the COVID-19 vaccine; and (3) a leading from God, through prayer, not to take the vaccine.

117.    On November 22, 2021, Mr. Whiteside received an email denying his request.  It stated that "we acknowledge that you are making a request based on your faith as a Christian, although not one that appears to be in accordance with the view of the vast majority of Christian denominations."  Already FM Global was attempting to denigrate his beliefs in order to advance the company's coercive agenda.  Mr. Whiteside was told he could submit additional information to attempt to validate his initial request, which he did along with a letter from his pastor.

118.    The week of Thanksgiving, FM Global sent a formal communication to all US employees (but not employees in other countries) that all employees unvaccinated as of December 15, 2021 would be terminated.

119.    On December 9, 2021, Mr. Whiteside received a formal and final denial of his religious accommodation request.  It stated that "after careful review, the Company has determined that you have not shown a satisfactory basis for an accommodation on religious grounds and the request is therefore denied."

120.    At no point during this process was he contacted to request clarification of his request or his religious beliefs.  All determinations were made through the familiar set of invasive

questions designed to attack claims of religious sincerity, without objective grounds to do so in the first place.

121.    Throughout the remainder of his time at FM Global, Mr. Whiteside continued to be singled out for being unvaccinated because of his religious beliefs.

122.    Once his final denial was provided, Mr. Whiteside was bombarded with phone calls from his manager, Melinda Smith (HR Manager), and the Dallas Operations Manager asking why he would not get vaccinated and trying to coerce him into getting the shot to keep his job.

123.    Then, while still employed, he had an incident with his company credit card while traveling for work where the card was declined because someone at the company evidently thought he was attempting to steal from FM Global.  The individual deactivated Mr. Whiteside's card without any communication to Mr. Whiteside, his manager, or HR, and without conducting any formal review process of the expense in question.  Because none of the purchases made by Mr. Whiteside were even questionable, he understood this to be another retaliatory act against him for his beliefs.

124.    A few days later, Ms. Smith called to speak with Mr. Whiteside about his vaccination status.  The conversation was cordial at first because she had assumed that he was willing to lose his job only because he did not want to provide proof of vaccination.  Once she learned that Mr. Whiteside was unvaccinated (because of his religious beliefs), Ms. Smith's tone changed dramatically and she began shouting obscenities at Mr. Whiteside, demanding to know why he thought he should not get vaccinated.  She eventually told him that he would "never find another job without being vaccinated."  This was just one example of the aggressive phone calls Mr. Whiteside received from FM Global employees and managers over the vaccine.

125.    From October to December of 2021, Mr. Whiteside also fielded numerous phone calls from FM Global employees who were distraught about getting the vaccine.  Friends and coworkers would call crying and saying how they had not slept in days due to the anxiety they were having over the decision.  One close friend of Mr. Whiteside sat in the parking lot of the clinic crying for 30 minutes on December 14, 2021 before leaving, only to return the following day to take the vaccine because it was the final day employees were allowed to take the vaccine to keep their jobs.  The stress, coercion, and hostile work environment that had been created by FM Global was unconscionable as a great number of those people had been denied a reasonable accommodation for their religious beliefs by a company that cared more about its image than its employees.

126.    In one final act of retaliation toward Mr. Whiteside, his manager called him on December 23, 2021 stating that if he did not complete a report by December 27, 2021, he would not be paid his annual bonus.  That ultimatum had been handed down from the same manager who had deactivated Mr. Whiteside's credit card a few weeks earlier.  The only reason the report was not already complete, though, was because of other FM Global employees' delays in getting Mr. Whiteside access to the report.  Because it was not his fault, Mr. Whiteside should not have been responsible for completing the report since he was on vacation and the company was in the process of firing him.  Management held his already-earned bonus over his head, though, as a further punishment for his religious beliefs conflicting with the company's edict.

127.    Mr. Whiteside and his wife run a gym in Texarkana, and he has been exposed to COVID-19 on multiple occasions over the past two and a half years.  Because he has never knowingly had a COVID infection, it is likely that he is one of the individuals naturally immune to the virus or has just recovered from an asymptomatic infection at some point.  A vaccine would

thus have had no effect whatsoever on Mr. Whiteside's immune system (except only to possibly weaken it).  Regardless, it would not matter because FM Global refused to allow employees who had been immunized naturally to continue working.

128.     Rather than consider something such as natural immunity (which he would have been willing to demonstrate) or the ability of Mr. Whiteside to mitigate any potential increased risk he *might* have caused by being unvaccinated, FM Global proceeded to terminate Mr. Whiteside on January 4, 2022.

129.     Not only was FM Global's action against Title VII, it was also a violation of Texas Executive Order GA-40, issued on October 11, 2021.  FM Global is an "entity in Texas"—as shown by the presence of its office in Frisco, Texas—that "compel[led] receipt of a COVID-19 vaccine" by an employee "who object[ed] to such vaccination . . . based on a religious belief."

130.     The financial and emotion damages of Mr. Whiteside are substantial.  In addition to the loss of a substantial salary, he was disrespected by people to whom he had looked up for years, talked down to by his peers as a result of the work environment created by FM Global, and then criticized and even dehumanized for his religious beliefs.  Finally, he was threatened by management and even blackmailed in his final days of employment with the company.

***Tyler Smith***

131.     Plaintiff Tyler Smith was an Account Manager with FM Global.  He worked for the company for more than eleven years.

132.     In that role, Mr. Smith performed insurance servicing and underwriting activities on existing accounts as well as supporting new business.  He was also responsible for the overall account team leadership.

133.    Mr. Smith was a consistently high performer for the company and even received special commendations for his work during the pandemic in 2020.  From March 13, 2020 until his termination on January 4, 2022, he worked exclusively from home.

134.    In September 2021, Mr. Smith received a notice that employees expecting to return to their US office during October were asked to upload a proof of vaccination.  Because he had no plans to enter an FM Global office for the foreseeable future, Mr. Smith did not upload anything.

135.    The message shifted in an October 8, 2021 email.  The company now stated that "all employees [must] submit proof of vaccination."  That notification also provided, however, that medical or religious exemptions could be granted and the employee would need to wear a mask while in the office and have a negative COVID test each week.

136.    Upon receiving the email, Mr. Smith sought information on how to pursue an exemption from the mandate and was emailed a form to complete that day.  He submitted his request for an exemption based on his sincerely held religious beliefs on October 21, 2021.

137.    In his request, Mr. Smith went into great detail about how taking the COVID-19 vaccine would be in conflict with all four of the core virtues of his religion: Stoicism.  In order to live in harmony with the Divine Reason, the followers of Stoicism—an ancient tradition dating back to the Greeks—cannot violate the core teachings of the religion.

138.    While Stoicism is not a standard religion with which FM Global was familiar (not that it would have mattered to the company anyway), Mr. Smith clearly explained how and why each of the virtues of his religion conflict with the vaccine mandate and why he declines the flu shot each year for essentially the same reasons.

139.    Later that same day, Mr. Smith received an email indicating that all US-based employees entering an FM Global office in the US must be fully vaccinated by November 15,

2021 and that any US employee "fully vaccinated" against COVID-19 must upload their proof of vaccination by that date.

140.    After making that submission, FM Global followed up with Mr. Smith on November 3, 2021.  The company sent him the same standard letter sent to other employees seeking a religious accommodation.  It asked:

- Given what we have noted in our letter to you dated **October 18, 2021**, please clarify the precise connection between your religious principle, practice, tenet or belief and your inability to receive a COVID-19 vaccine and why:

- In support, please provide an independent statement of religious doctrine, from an authoritative religious leader or body where your religion has same, explaining what prohibits followers of your religious principle, practice, tenet or belief from receiving a COVID-19 vaccine:

- Since the age of 18, have you received any vaccination(s) (please circle YES or NO only – **do not provide any additional information at this time** and please note that we reserve the right to ask your medical practitioner to confirm your response): YES    NO

- Since the age of 18, have you taken any pharmaceutical(s) (drugs), whether prescription or non-prescription (over-the-counter) (please circle YES or NO only – **do not provide any additional information at this time** and please note that we reserve the right to ask your medical practitioner to confirm your response):    YES    NO

141.    As was obvious from FM Global sending the same canned response to each individual seeking a religious accommodation, the company was not interested in learning more

about its employees' sincerely held religious beliefs (and in truth, had no objective basis for seeking additional information after the detailed requests had been submitted). The "follow-up" questions were only meant to be a coercion tool the company could use to deny exemption requests.

142. Even though Mr. Smith understood that FM Global was not moving forward with a good-faith interactive process, he nevertheless answered the company's questions and even sought to amend his accommodation request to align exactly with the guidance that had been issued in the Occupational Safety and Health Administration ("OSHA") Emergency Temporary Standard ("ETS") for unvaccinated individuals. He offered to test himself weekly and submit those results to FM Global and to follow any protocols required by clients for visitors or on-site contractors.

143. Mr. Smith never received a response to this attempt at an interactive process that could arrive at a reasonable accommodation.

144. Melinda Smith from FM Global responded on November 16, 2021, reminding Mr. Smith that "FM Global has been very clear that all client-facing employees must be fully vaccinated." He responded that he understood the policy—and that was precisely why he needed an accommodation from the mandate. If there was no policy, he would not need an accommodation.

145. It was once again made clear to Mr. Smith that FM Global was merely looking to check a box to say that it had provided an "interactive process" when, in reality, the company never had any intention to grant accommodations to its client-facing employees who needed a religious exemption. FM Global viewed such an act as a concession that undermined its image and would distort its signaling to others outside the company.

146.    On November 23, 2021, the incoming CEO of FM Global emailed all US employees to state that non-compliance with the vaccine mandate would be met with termination on January 4, 2022.  The first dose of the vaccine would have to be taken by mid-December in order to maintain employment with the company.

147.    Then, on November 30, 2021, Mr. Smith received the standard FM Global denial that "[a]fter careful review, the Company has determined that you have not shown a satisfactory basis for an accommodation on religious grounds and the request is therefore denied."

148.    Mr. Smith responded on December 2, 2021, making clear that he did not want to lose his job and seeking an explanation as to how his beliefs were not sincere and/or religious enough to warrant an accommodation.  He tried to explain even further to the company how Stoicism parallels other religions that are more typical or traditional.

149.    Over the next few weeks, Mr. Smith was asked to participate in dinners, lunches, and phone calls where management continually attempted to persuade him to abandon his religious beliefs and comply with FM Global's mandate.   Although the process was invasive, discriminatory, and harassing, he felt that he had to participate to make it through the end of the year so that he could receive his annual bonus.

150.    On December 23, 2021, employees were notified that the January 4, 2022 reopening would not be taking place due to the Omicron variant (which the vaccines required by FM Global did not even cover).   While the reopening was being delayed until February, the January 4 termination date was not altered, even though FM Global knew at the time its vaccine mandate was not preventing transmission.

151.    Rather than engage in an interactive process with Mr. Smith geared toward finding a reasonable accommodation (multiple no-cost options were easily discernable), FM Global went about an organized, deliberately implemented process to discriminate against religious employees.

152.    And thus rather than make an allowance for either Mr. Smith's natural immunity or his voluntary ability to test in lieu of taking the vaccine—a safer option since vaccination does not prevent transmission—FM Global proceeded to terminate Mr. Smith on January 4, 2022.

153.    Alternatively, FM Global could have allowed Mr. Smith to continue working remotely as he had throughout the pandemic—at least until the public realized a few months later that the pandemic had subsided.

154.    Critically, none of Mr. Smith's clients required visitors or contractors to show proof of vaccination and therefore he could have continued to do his job following the normal safety protocols for each business.

155.    Not only was FM Global's action against Title VII, it was also a violation of Texas Executive Order GA-40, issued on October 11, 2021.  FM Global is an "entity in Texas"—as shown by the presence of its office in Frisco, Texas—that "compel[led] receipt of a COVID-19 vaccine" by an employee "who object[ed] to such vaccination . . . based on a religious belief."

156.    It is clear evidence of Mr. Smith's sincerely held religious beliefs that he was willing to put his livelihood at risk when he has a wife and four children to support.

157.    But while Mr. Smith had never been forced to defend his sincerely held religious beliefs to anyone, he suddenly found himself at the mercy of a corporation that deemed itself the arbiter of proper religious beliefs and the relationship between its employees and a Higher Power.

158.    FM Global's actions have harmed and continue to harm Mr. Smith both financially and mentally.   In addition to losing a substantial amount of income, he was subjected to discriminatory, harassing, and deeply inappropriate actions from FM Global.

## CLASS ALLEGATIONS

159.    Plaintiffs bring this class action under Federal Rules of Civil Procedure 23(a) and (b).

160.    Through this action, Plaintiffs seek to represent a class of all FM Global employees whose requests for accommodations from FM Global's vaccine mandate were denied and who were thus put to the decision of either taking a vaccine to which they objected for religious reasons, or suffering termination.

161.    By determining there would be no reasonable accommodations for any employee requesting a religious exemption from the vaccine mandate, FM Global effectively treated all religious accommodation requesters the same.   Each request that offered an explanation of the sincerely held religious belief was met with the same form questionnaire that sought to give the veneer of an interactive process while, at the same time, collect personal information from the employees that the company might be able to use as a pretextual denial.   FM Global's actions were thus generally applicable to the entire class of FM Global employees for whom FM Global failed to grant reasonable accommodations.   Accordingly, the Court may grant relief to the entire affected class to remedy FM Global's violation of federal civil rights laws.

162.    Additionally, the class is so numerous that joinder of all members is impractical. While the exact class size is unknown to Plaintiffs at this time, it is expected to exceed 50 employees and may be in the hundreds.   The precise number and identification of the class members will be ascertainable from FM Global's records during discovery.

163.    There are questions of law and fact common to all members of the class.  Those common questions include, but are not limited to, the following:

   a.    Did FM Global comply with federal law when it made a determination to deny all religious accommodation requests regardless of their validity?

   b.    Did FM Global comply with federal law when it denied religious accommodation requests even though it was within the company's power to accommodate them (as it did with no-cost or less than *de minimus* costs for those who made medical requests)?

   c.    Did FM Global comply with its obligations under federal law to engage in the interactive process when responding to accommodation requests solely by seeking ways to avoid granting accommodations?

   d.    Did FM Global comply with its obligations under federal law to reasonably accommodate employees with religious objections to the vaccine mandate when it failed to consider reasonable, cost-free alternatives to termination for those unable to take the COVID-19 vaccine?

   e.    Did FM Global retaliate against employees who engaged in protected activity when it responded to each religious request by terminating employment, but only after engaging in coercive, unwelcome, and invasive conduct to dissuade employees from requesting (or continuing to seek) an accommodation?

   f.    Did FM Global create a hostile work environment toward employees unable to take a COVID-19 vaccine because of their religious beliefs and discriminate against them because of those beliefs?

g.     Did FM Global's policy disparately impact employees unable to take a COVID-19 vaccine because of their religious beliefs?

164.   Plaintiffs' claims are typical of the claims of the class because they, like the class members, requested accommodations from FM Global's vaccine mandate and FM Global denied those requests without engaging in a good-faith interactive process.

165.   For the same reason, Plaintiffs will fairly and adequately protect the interests of the class.

166.   The questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating Plaintiffs' claims.   Joinder of all members is impracticable.

167.   As explained above, FM Global has taken at least one relevant act that affects all members of the class as represented by the named Plaintiffs harmed in this District.

**COUNT I**
**Violation of Title VII, 42 U.S.C. § 2000e, *et seq.***
**Religious discrimination—disparate treatment**
**On behalf of Plaintiffs Culver, Maner, Whiteside, and Smith,**
**and others similarly situated**

168.   Plaintiffs restate the foregoing paragraphs as if set forth fully herein.

169.   Plaintiffs each hold sincere religious beliefs that preclude them from receiving a COVID-19 vaccine.  FM Global has speculated as to the sincerity of Plaintiffs' beliefs but each individual provided a set of beliefs that was comprehensive and clear, even if the company did not understand or want to credit those beliefs.

170.   Indeed, Plaintiffs' beliefs were sincere enough to cause each of them to accept termination from a lucrative career they loved rather than betray their beliefs.

171.    Plaintiffs informed FM Global of those beliefs and requested religious accommodations from the vaccine mandate.

172.    By requesting religious accommodations from FM Global, Plaintiffs established themselves as members of a protected class.

173.    Plaintiffs' employee records demonstrate unquestionably that they were qualified for the position.  That is why, prior to the mandate, Plaintiffs had no indication that their jobs were in jeopardy—indeed, they had each been successful for a substantial amount of time prior to the vaccine edict and, absent FM Global's unlawful actions, would still be working there.

174.    Plaintiffs suffered an adverse employment action when FM Global terminated them after they declined—on religious grounds—to take the COVID-19 vaccine.

175.    At the same time, others in the company were provided accommodations from the vaccine mandate for secular reasons and not terminated.

176.    FM Global claims that it could not accommodate Plaintiffs without undue hardship, yet Plaintiffs could have been accommodated effortlessly through masking/testing, recognition of natural immunity, remote work, or any combination of these options.  This was seen through the company's accommodation of employees with medical exemption requests, and by the fact that the company had effectively accommodated all employees for many months before imposing its vaccine mandate.

177.    And at the same time FM Global was discriminating against Plaintiffs, the company knew that vaccinated employees were regularly contracting and spreading COVID-19.

178.    All this evidences pretext on the part of FM Global since the company has proffered an undue hardship explanation that is "unworthy of credence"—it is apparent that unlawful

discrimination was more likely the employer's motivation.  *Texas Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 256 (1981).

179.    Religious employees who were willing to participate in safety measures such as remote work, masking, and testing and/or who had natural immunity were terminated; secular employees who were immunized artificially (even those immunized with an incomplete vaccine series providing arguably inferior immunization) were allowed to keep their jobs, as were secular employees with medical excuses not to take the vaccine.

180.    FM Global's policies were thus punitive toward religious employees such as Plaintiffs who should have been accommodated.  Many, if not all of them, had natural immunity to the virus and therefore posed an equal or lower risk to others than the vaccinated secular employees who had not previously contracted COVID-19.[7]  Additionally, they were all willing to observe safety practices such as remote work, masking, and testing.  Not only had such measures been adequate for the prior 18+ months of the pandemic, remote work and/or testing represented the best means of reducing/preventing COVID-19 transmission for both vaccinated and unvaccinated individuals.[8]

181.    Yet FM Global treated religious employees worse because of their religious objection to the vaccine.  (A truly preventative policy would have required something such as regular testing for all employees, especially those who had not previously recovered from a COVID-19 infection *even if they were vaccinated*.)

---

[7] Medically speaking, both vaccinated and unvaccinated individuals posed a risk of virus transmission, though vaccinated individuals realistically posed an even greater risk due to their ability to possess high viral loads while having reduced symptoms, *see infra,* fn. 2 (thus making them less likely to take other mitigation steps such as social distancing).

[8] Since both vaccinated and unvaccinated individuals have a similar risk of virus transmission, testing to ensure lack of infection and/or remote work options, which completely prevent transmission, represent the most effective means of reducing or preventing transmission.

182.    In other words, FM Global required naturally immune religious employees to possess hybrid immunity (vaccine-based immunity + natural immunity) and subjected them to heightened safety protocols because of their religious beliefs.  At the same time, FM Global rewarded secular vaccinated employees, even though they presented an equal or greater contagion hazard relative to religious naturally immune employees, because FM Global favored those employees' views on COVID-19 vaccines.

183.    Moreover, the company enforced its policy with the full knowledge and with intent to adversely affect religious employees disproportionately.  Indeed, instead of implementing plans to accommodate religious employees, FM Global implemented discriminatory policies and created a questionnaire design to assist the company in denying religious exemption requests.  After denying 100% of religious exemption requests, the company cannot now argue that the accommodations process was actually instituted in good faith.

184.    FM Global never planned to provide Plaintiffs a reasonable accommodation and its supposed "interactive process" sought only to gain information it might later be able to use against Plaintiffs who deigned to push back on the company's unlawful actions.  FM Global subjected Plaintiffs to its sham process, seeking information about people's beliefs, personal information, and medical histories even though the company never planned to accommodate them anyway. This all took place because of Plaintiffs' religious beliefs and they would not have had to undergo that process but for their sincerely held religious beliefs about the COVID-19 vaccine.

185.    FM Global plainly did not want religious requests to succeed and purposefully plotted to deny those requestors.

186.     Because of FM Global's comprehensive pattern and practice of unlawfully distinguishing between secular and religious employees, Plaintiffs believe many additional instances of disparate treatment discrimination will ultimately be revealed.

187.     Any non-discriminatory reason proffered by FM Global—such as increased safety—is pretextual.   By allowing vaccinated employees to avoid necessary preventative measures like testing, while not even allowing exempt employees like Plaintiffs to use them, the company has undermined any legitimate nondiscriminatory reason it might have tried to claim as it relates to workplace safety.   Moreover, as the evidence shows, the safety justification for treating unvaccinated employees differently (especially those with natural immunity) was non-existent long before FM Global put people out of work here.   At all relevant times, it was abundantly clear that vaccines were not preventing transmission of the virus.   And once the Omicron variant swept across the country in December of 2021, no reasonable employer could credibly rely on the available vaccines as a foolproof countermeasure to the virus.   It was thus unlawful to continue discriminating against religious employees.

188.     If FM Global's justification truly was to help provide for a safe work environment during the COVID-19 pandemic, the company would not have singled out those who had natural immunity and/or were willing to submit to testing for worse treatment because they could not take the vaccine for religious reasons.

189.     But, as discussed in greater detail above, the safety argument was clearly a pretext. FM Global's purposeful attack on religious beliefs is made apparent by the company's willful ignorance of the science and the CDC's guidance in March, July, and August of 2021, establishing that the vaccines did not reduce virus transmission.

190.    The vaccine was used as a tool to weed out religious individuals whose beliefs FM Global disfavored.

191.    Considering these factors, a strong inference of intentional religious discrimination exists, and any non-discriminatory reason asserted by FM Global is inauthentic.

### COUNT II
### Violation of Title VII, 42 U.S.C. § 2000e, *et seq.*
### Religious discrimination—failure to accommodate
### On behalf of Plaintiffs Culver, Maner, Whiteside, and Smith,
### and others similarly situated

192.    Plaintiffs restate the foregoing paragraphs as if set forth fully herein.

193.    Plaintiffs each hold sincere religious beliefs that preclude them from receiving a COVID-19 vaccine.  Indeed, their beliefs were sincere enough to cause them to accept termination from a lucrative career they loved rather than betray their beliefs.

194.    Plaintiffs informed FM Global of those beliefs and requested religious accommodations from the vaccine mandate.

195.    FM Global refused to engage in an actual interactive process with Plaintiffs regarding their religious accommodation requests and instead only responded to Plaintiffs with questions (or other coercion) designed to deter Plaintiffs from exercising their religious beliefs.

196.    FM Global did not bother engaging in a true interactive process with religious accommodation seekers because it never intended to provide them with a reasonable accommodation.

197.    Irrespective of the interactive process, FM Global failed to provide Plaintiffs with reasonable accommodations for their religious beliefs.

198.    In fact, FM Global failed to consider reasonable accommodations (such as masking, testing, and natural immunity) because it never intended to accommodate religious employees and was only interested in coercing them to take the vaccine.

199.    If the vaccine manufacturers can provide reasonable accommodations during a pandemic, though, then FM Global could have done so as well.

200.    The company's attempts to dodge providing reasonable accommodations by casting aspersions on Plaintiffs' religious objections to the vaccine fail on their face.  Each Plaintiff detailed sincerely held religious beliefs only to be rejected when the Company claimed to have "determined that [the employee] not shown a satisfactory basis for an accommodation on religious grounds."  This so-called determination was a sham, however, since the denial was predetermined before the request was made as part of a pattern of discrimination against those unable to take a COVID-19 vaccine because of their sincerely held religious beliefs.

201.    The rejections of Plaintiffs' beliefs were simply transparent rejections of religion as a suitable reason not to become vaccinated.  FM Global did not prefer religious requests and determined as a result not to accept religious exemption requests.  The canned denial letters that failed to grapple with Plaintiffs' requests are further proof that the company did not treat religious requests in good faith align with the company's overall pattern of discrimination.

202.    FM Global thereby discriminated against Plaintiffs because of their religious beliefs.

203.    FM Global's failure to provide religious accommodations has harmed and will continue to harm Plaintiffs.

204.    By failing to engage in a true interactive process or offer any reasonable accommodation, FM Global's discriminatory actions were intentional and/or reckless and in violation of Title VII.

### COUNT III
### Violation of Title VII, 42 U.S.C. § 2000e, *et seq.*
### Religious discrimination—retaliation
### On behalf of Plaintiffs Culver, Maner, Whiteside, and Smith,
### and others similarly situated

205.    Plaintiffs restate the foregoing paragraphs as if set forth fully herein.

206.    Plaintiffs engaged in protected activity when they requested religious accommodations from FM Global's vaccine mandate.

207.    As with other religious employees, FM Global responded with improper questioning of the Plaintiffs' religious beliefs aimed at either forcing the employees to acquiesce or preparing a legal defense against the employees' Title VII rights ahead of time.

208.    The company also subjected religious employees to unwanted coercion and other tactics aimed at punishing their beliefs and making them regret requesting an accommodation based on religious grounds.

209.    This coercion was a concerted effort from Executive Management—a fact the company did not try to hide.

210.    Finally, FM Global terminated Plaintiffs as a result of their requests for a religious exemption.  Had they sought a medical exemption, they would have been subject to neither the ongoing coercion nor termination.

211.    Plaintiffs' religious beliefs and protected activity were the causes of FM Global's adverse employment action.

212.     By retaliating against Plaintiffs for engaging in protected activity, FM Global violated Title VII.  This violation has harmed and continues to harm Plaintiffs.

## COUNT IV
### Violation of Title VII, 42 U.S.C. § 2000e, *et seq.*
### Religious discrimination—hostile work environment
### On behalf of Plaintiffs Culver, Maner, Whiteside, and Smith,
### and others similarly situated

213.     Plaintiffs restate the foregoing paragraphs as if set forth fully herein.

214.     As vaccines began increasing in popularity—especially with FM Global management—the company began creating a culture where the unvaccinated were shunned and ridiculed, no matter their personal reason for being unvaccinated.

215.     FM Global was aware that that there were those such as Plaintiffs who would be unable to take the vaccine due to their religious beliefs.

216.     Nevertheless, management continued to harass, coerce, ridicule, shame, intimidate, threaten, and blackmail unvaccinated employees in a concerted effort to make them acquiesce to the medical treatment.  Management also encouraged co-workers to engage in the same unwanted treatment.

217.     This harassment was focused on those unable to take the vaccine for religious reasons.  Indeed, FM Global accommodated those who could not take the vaccine for medical reasons.  Rather the disparate treatment at the company was reserved for religious employees who were singled out for further vaccine recruitment once FM Global became aware of their need for an accommodation.   In fact, management purposefully went out of its way to "encourage" unvaccinated religious employees to take the vaccine (an unwelcome "encouragement" that only added to the stress and pressure FM Global was already putting on its religious employees who were struggling with the fact that they were about to lose their jobs).

218.    These actions by FM Global subjected Plaintiffs—and others like them—to additional stress and created a hostile work environment that made them regret ever going to work for FM Global.

**COUNT V**
**Violation of Title VII, 42 U.S.C. § 2000e, *et seq.***
**Religious discrimination—disparate impact**
**On behalf of Plaintiffs Culver, Maner, Whiteside, and Smith,**
**and others similarly situated**

219.    Plaintiffs restate the foregoing paragraphs as if set forth fully herein.

220.    Plaintiffs each hold sincere religious beliefs that preclude them from receiving a COVID-19 vaccine.  Indeed, their beliefs were sincere enough to cause them to accept termination from a lucrative career they loved rather than betray their beliefs.

221.    Plaintiffs informed FM Global of those beliefs and requested religious accommodations from the vaccine mandate, thus identifying themselves to the company as part of a protected class.

222.    FM Global's mandate had an adverse effect on employees unable to take a COVID-19 vaccination for religious reasons.

223.    It is believed that one hundred percent of those unable to take the vaccine for religious reasons were terminated, confirming its disparate impact on that protected group.

224.    This violation of Title VII has harmed and continues to harm Plaintiffs.

## PRAYER FOR RELIEF

Plaintiffs request that the Court:

a.        Certify this action as a class action under Federal Rules of Civil Procedure 23(a) and (b).

b.        Declare that FM Global has violated Title VII by discriminating against employees seeking religious accommodations to its COVID-19 vaccine mandate, disfavoring their exemption requests because they were based on religious reasons rather than secular ones.

c.        Declare that FM Global has violated Title VII by failing to engage in a good-faith interactive process and provide reasonable accommodations in response to requests for religious accommodations to its COVID-19 vaccine mandate.

d.        Declare that FM Global has violated Title VII by retaliating against employees who engaged in protected activity.

e.        Declare that FM Global has violated Title VII by creating a hostile work environment against those unable to take a COVID-19 vaccine for religious reasons.

f.        Declare that FM Global's vaccine mandate—with no accommodations for religious employees—had a disparate impact on those unable to take a COVID-19 vaccine for religious reasons.

g.        Issue a permanent injunction, enjoining FM Global from terminating or failing to promote/hire any employee who has a religious basis for seeking an accommodation from a COVID-19 vaccine mandate and ordering reinstatement for those employees willing and able to return to work at FM Global.

    h.    Award Plaintiffs, and those similarly situated, damages, including back pay, reinstatement or front pay, pre-judgment and post-judgment interest, punitive damages, and compensatory damages.

    i.    Award Plaintiffs reasonable attorneys' fees and costs.

    j.    Grant any other relief that the Court deems just, proper, and equitable.

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a jury trial on all issues upon which there is a federal right to a jury trial.

November 21, 2022                        Respectfully submitted,

                                      */s/ John C. Sullivan*
                                      John C. Sullivan
                                      Texas Bar No. 24083920
                                      **S|L Law PLLC**
                                      610 Uptown Boulevard, Suite 2000
                                      Cedar Hill, TX 75104
                                      Telephone: (469) 523-1351
                                      Facsimile: (469) 613-0891
                                      john.sullivan@the-sl-lawfirm.com

                                      ***COUNSEL FOR PLAINTIFFS***
                                      ***AND THE PROPOSED CLASS***